# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Jan 16, 2024
s/ D. Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No. 24 MJ 21 |
| Instagram accounts A-D, as further described in Attachment A | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❐ contraband, fruits of crime, or other items illegally possessed;

❐ property designed for use, intended for use, or used in committing a crime;

❐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2119 | Carjacking. |
| 21 U.S.C. § 841(a)(1) | Distribution of a controlled substance. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

❐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Rick Hankins*
Digitally signed by RickHankins409017232-92997
DN: c=US, o=Sprint, ou=External, ou=eSite, cn=RickHankins409017232-92997
Date: 2024.01.12 15:58:22 -06'00'

*Applicant's signature*

Rick Hankins, ATF SA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone _____ *(specify reliable electronic means)*.

Date: 01/16/2024

*William E. Duffin*

*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable William E. Duffin, U.S. Magistrate Judge

*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF**</u>
<u>**AN APPLICATION FOR A SEARCH WARRANT**</u>

I, Rick Hankins, being first duly sworn, hereby depose and state as follows:

**<u>INTRODUCTION AND AGENT BACKGROUND</u>**

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Instagram account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), an electronic communications service and/or remote computing service provider headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent of the U.S. Department of Justice's ATF, currently assigned to the Milwaukee Field Office. I have been so employed since April 2003. My duties as a Special Agent with the ATF include investigating alleged violations of the federal firearms, explosives, and arson statutes.

3.      I have completed approximately 26 weeks of training at the Federal Law Enforcement Training Center in Glynco, Georgia, as well as the ATF National Academy.  That training included various legal courses related to constitutional law as well as search and seizure

1

authority. Additionally, I have received training on how to conduct various tasks associated with criminal investigations, such as interviewing, surveillance, and evidence collection.

4. In addition to my duties as a criminal investigator, I am also an ATF Certified Fire Investigator (CFI). As an ATF CFI, I am tasked with providing expert opinions as to the origin and cause of fires. I obtained the ATF CFI certification in 2009 following a two-year training program that centered on various fire science topics including, but not limited to: chemistry, fire dynamics and building construction. The two-year ATF CFI certification program consisted of college courses, written exams, research papers, reading assignments, practical training exercises and test burns of various materials. I am re-certified annually as an ATF CFI. To date, I have participated in over 300 fire scene examinations and have testified as an expert. Additionally, I have been certified as a fire investigator by the International Association of Arson Investigators since June 2011. I have received over 1,600 class hours of fire-related training. Furthermore, I have been an instructor regarding fire-related topics on multiple occasions for many agencies and institutions in several states. I have also participated in over 223 live fire training exercises, where I started training fires and observed fire growth and development. Finally, I was a full-time instructor at the ATF National Academy from approximately August 2015 to August 2016, where I taught several topics during Special Agent Basic Training for new ATF recruits. Specifically, I was a primary instructor for the arson block of training at the ATF Academy.

5. This affidavit is based upon my personal knowledge as well as information provided to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is also based upon information gathered from interviews of citizen witnesses, reports, official records, law enforcement reports, and my training and experience.

2

6.      As an ATF agent, I have participated in the investigation of firearms and narcotics-related offenses, resulting in the prosecution and conviction of individuals and the seizure of illegal drugs, and weapons. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances.

7.      Based on my training, experience, and participation in drug trafficking and firearms trafficking investigations, I know and have observed the following:

8.      Through informant interviews and debriefings of individuals involved in firearm and narcotic offenses, I have learned about the manner in which individuals and organizations finance, purchase, transport, and distribute firearms and narcotics. I have also conducted surveillance of individuals engaged in firearms and drug trafficking, and participated in the execution of numerous search warrants, resulting in the seizure of drugs, firearms, ammunition, and magazines.

9.      Based on my training and experience, I have become familiar with the language utilized over the telephone to discuss firearms and drug trafficking, and know that the language is often limited, guarded, and coded. I also know that firearms and drug traffickers often use electronic devices (such as computers and cellular phones) and social media to facilitate these crimes.  Further, they keep those devices, especially cell phones, on their person for ready access. Based on my experience, I know that firearms traffickers may keep photographs of firearms, controlled substances, and related items on electronic devices.

10.      I also know that drug traffickers and firearms traffickers commonly possess—on their person, at their residences, at their places of business, in their vehicles, and other locations where they exercise dominion and control—firearms, ammunition, and records or receipts pertaining to such.

3

11.	The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

12.	Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C. § 2119 (carjacking) and Title 21 U.S.C. § 841(a)(1) (distribution of a controlled substance) have been committed by Geo OWENS[1], Jhony MARCHENA, Marquis HARRIS, Kentreal EVANS, Damonti LOCKHART), and others.  There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B and that there is also probable cause to search the "Target Accounts" described below and described in Attachment A, for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## TARGET ACCOUNTS TO BE SEARCHED

A.	Instagram account under the name "thousand_8gramsz" / Instagram ID #19472308189 (An account associated with Jhony MARCHENA), **https://www.instagram.com/thousand_8gramz/**

B.	Instagram account under the name "stayingoutyoway" / Instagram ID #48331892912 (An account with public images consistent with Kentreal EVANS), **https://www.instagram.com/stayingoutyoway/**

---

[1] Your affiant has previously received similar records of the Instagram Account of Geo OWENS pursuant to a prior federal search warrant.

4

C. Instagram account under the name "lowrackedd2" / Instagram ID #54098924269 (An account associated with Damonti LOCKHART), **https://www.instagram.com/lowrackedd2/**

D. Instagram account under the name "lilquis_4" / Instagram ID #800293840 (An account suspected to be associated with Marquis HARRIS, who goes by the name "Quis"), **https://www.instagram.com/lilquis_4/**

## PROBABLE CAUSE

13. In this application I will describe a robbery/carjacking and shooting that took place February 19, 2023, and the investigation which led to my belief that the robbery was planned and executed by at least 6 individuals. The individuals involved included Alfredo ACOSTA, who ended up a shooting 'victim' due to the incident. I will also describe evidence of marijuana distribution involving Geo OWENS and the four target accounts which has come to light during the above-mentioned carjacking investigation. I believe this affidavit sets forth probable cause that the Target Instagram Accounts contain evidence of both the carjacking and marijuana distribution as described below.

14. On February 19, 2023, at approximately 5:43AM, the Milwaukee Police Department responded to a shooting near 1727 West Mineral Street, Milwaukee, Wisconsin **("Location 1")**. Upon their arrival, police subsequently located Alfredo ACOSTA, who had been shot multiple times. ACOSTA was found lying on the front porch of XXXX South 18th Street and transported to a hospital.

15. The Milwaukee Police Department later interviewed ACOSTA who stated he and his friend, C.B., were at Potawatomi Casino and then went to a party near South 34th Street and West Pierce Street in Milwaukee **("Location 2")**. ACOSTA said he was driving a Chrysler 300 car that had been rented by his brother, who was later identified as M.A. As he and C.B. left the party and were walking to the Chrysler 300, ACOSTA said they were approached by 5 unknown

5

black males wearing ski masks and carrying firearms. ACOSTA stated he was struck multiple times in the head by the suspects' firearms while the suspects demanded to know where "the money was." ACOSTA stated he told the suspects he did not know what they were talking about. ACOSTA further said the suspects went through his pockets and took his money, necklace, grills, cellphone [phone # (262) 283-2021], and keys to the Chrysler 300 rental car. ACOSTA said he and C.B. were then forced at gunpoint into the suspects' white SUV. ACOSTA stated the suspects drove him and C.B. to C.B.'s address after C.B. provided his address. ACOSTA said the suspects exited the SUV at one point, at which time he exited the SUV and attempted to run away. ACOSTA stated he heard multiple gunshots and was struck multiple times in his leg, ankle, and foot. ACOSTA believed C.B. was targeted for the robbery because C.B. has posted social media videos in which C.B. had flashed a lot of money.

16. The Milwaukee Police Department also interviewed C.B, who stated he posted a message on Facebook on February 18, 2023, asking if anyone wanted to go out. C.B. said he received a phone call from ACOSTA, who he has known since high school, and they made plans to go out together. C.B. said ACOSTA picked him up in a 4-door Chrysler rental car. C.B. stated he, ACOSTA, and their friend M.H. first went to Element Nightclub in downtown Milwaukee and then to Potawatomi Casino. While at the casino, C.B. stated he received a phone call from a female he knew as "Pat" who invited him to a party near South 34th Street and West Pierce Street in Milwaukee. C.B. further said he is friends with "Pat" on social media. C.B. stated he and ACOSTA dropped Michael at home before going to the party. C.B. said he and ACOSTA stayed at the party for approximately 45-60 minutes and then left. As they were approaching ACOSTA'S Chrysler rental car, C.B. said two unknown vehicles stopped by them and five unknown male suspects (suspects) exited one of the vehicles. All five were wearing masks. C.B. further said the

6

masked suspects pointed firearms at C.B. and ACOSTA and C.B. was struck in the head with firearms prior to being forced into the suspect vehicle. C.B. said the suspects went through his pockets and took $200 cash and his Apple iPhone. C.B. said the suspects asked where they lived and C.B. provided his home address – XXXX West Mineral Street. C.B. further said ACOSTA fled the vehicle when they arrived at his address, so he also fled from the vehicle, ran into XXXX West Mineral Street, and did not come out until police arrived.

17. On February 19, 2023, at approximately 6:45AM, the Milwaukee Police and Fire Departments responded to a vehicle fire at 227 East Townsend Street, Milwaukee, Wisconsin **("Location 3")**. The burned vehicle was identified as a 2020 grey Chrysler 300 with WI license plate #11294AFT (VIN # 2C3CCAGG3LH146281), which was the same vehicle rented on February 18, 2023, by M.A. from Enterprise Car Rental located 5300 South Howell Avenue in Milwaukee, Wisconsin. A 911 caller stated they observed a black male suspect standing near the vehicle within seconds of the vehicle being engulfed in flames. The black male was wearing black clothing with a black face mask. Under these circumstances, I believe the rental car was a vehicle used in interstate commerce that was intentionally destroyed by means of fire.

18. On February 28, 2023, ATF interviewed C.B. and C.B. stated the party near 34th Street and Pierce Street was held inside a photography studio on the first floor of a commercial building. C.B. used digital Google Streetview images on Your Affiant's cellphone and initially identified 3530 West Pierce Street as the building where the party was held. Additionally, C.B. said an unknown Hispanic male traveled with C.B. and ACOSTA to the party. C.B. stated the unknown Hispanic male was an associate of ACOSTA who they ran into earlier that same night.

19. Also on February 28, 2023, ATF Agents learned that 3530 West Pierce Street was a U-Haul self-storage building and 3600 West Pierce Street had a photography studio on the first

7

floor, which was unlocked and open. ATF agents also located exterior surveillance cameras at XXXX South 36th Street that faced toward the intersection of West Pierce Street and South 36th Street and captured the front door of 3600 West Pierce. Agents viewed the surveillance video from February 19, 2023, and observed the 2020 Chrysler 300 arrive at approximately 4:36AM and park immediately across the street from the front door of 3600 West Pierce Street. Three individuals exited the Chrysler and subsequently entered 3600 West Pierce Street. The surveillance video also captured a white Jeep SUV travel by 3600 West Pierce Street on three occasions between 4:43AM and 4:46AM. What appeared to be the same white Jeep SUV backed into the north/south alley between 3600 West Pierce Street and 3530 West Pierce Street at approximately 4:54AM. The surveillance camera showed C.B., ACOSTA, and the unknown male exit 3600 West Pierce Street at approximately 5:17AM and walk to the Chrysler 300. ACOSTA had opened the driver's door and C.B. was near the middle of West Pierce Street when four suspects emerged from the area of the white Jeep SUV and appeared to point firearms at the victims at which time the victims got on the ground. The video showed suspects remove the shirt from C.B. and leave it in the road. The video further showed that C.B. and ACOSTA were ushered by the suspects into the white Jeep SUV while the unknown third male appeared to be placed in the Chrysler 300. The white Jeep SUV then traveled south on South 36th Street followed by the Chrysler 300, which was presumably driven by a suspect.

20.     On March 1, 2023, ATF agents interviewed Alfredo ACOSTA. ACOSTA stated he picked up C.B. and M.H. at C.B.'s house and they all went to Element night club and bar hopped. When he and C.B. left leaving an afterparty later that night, ACOSTA stated that 5-6 guys wearing masks rushed them and placed them in a suspect vehicle. Your Affiant asked ACOSTA what happened to the 3rd male in his vehicle that was also at the afterparty. ACOSTA

8

said he didn't recall a 3rd person in his vehicle that went to the afterparty with him and C.B. After the robbery, ACOSTA stated that the mother of his children called his cellphone number to see if he could retrieve his belongings. ACOSTA said the calls would keep ringing with no answer. While in the suspect's car, ACOSTA said he was thinking of ways to get out of the situation. When the suspects subsequently got out of the vehicle, ACOSTA said he saw his opportunity, so he got out and ran. ACOSTA stated the suspects chased him and he heard several gunshots and was hit 5 times. ACOSTA said that the suspects drove to C.B.'s house and parked near the middle of the street and he heard something about another car being there. ACOSTA said the driver and front passenger got out of the suspect vehicle and is not sure where they went. ACOSTA further stated that suspect seated next to him in the backseat later climbed into the driver seat after a vehicle passed by the suspect vehicle. ACOSTA said the backseat suspect that had climbed into the driver seat pulled the vehicle forward and honked the horn (because of the unknown vehicle that passed by), at which time the two suspects that had exited the suspect vehicle ran back to the vehicle. ACOSTA stated he jumped out of the backseat as the two suspects were returning to the vehicle. ACOSTA said after he fell to the ground from being shot, he got back up and ran on a broken ankle and hid under someone's porch. Acosta said he subsequently knocked on a door and asked them to call an ambulance. ACOSTA said the suspects had asked for a specific wristwatch owned by ACOSTA that ACOSTA was not wearing on the night of the robbery. When asked, ACOSTA said he has worn that wristwatch in photographs that he posted to Facebook. ACOSTA stated his Facebook profile name was "Alfredo Acosta" and included an image of him turned away from the camera. Acosta further said his Facebook account was open on his cellphone when the suspects took it. Your Affiant later located ACOSTA's Facebook account through open search and observed ACOSTA's profile image (Facebook ID #100004126687957). ACOSTA said he,

9

C.B., and M.H. also went to Potawatomi Casino on the night of the robbery.  ACOSTA said C.B. and M.H. went into the casino while ACOSTA went to drop off a girl he had met at Silk nightclub.

21.     Your Affiant reviewed T-Mobile records mapping Timing Advance "True Call" data which showed only one number found in the area of the shooting *and* kidnapping — (414) 975-7826, which listed to Kentreal EVANS at 3618 North 14th Street, Milwaukee, WI 53206 with an activation date of November 29, 2022.

22.     A review of the call detail records provided by T-Mobile showed that cellphone number (414) 975-7826 [EVANS] had multiple contacts with cellphone number (414) 526-1156 and (414) 788-9051 on February 18, 2023.  A further review of the call detail records also showed EVANS had contacts with cellphone number (414) 309-9038.  The users of (414) 526-1156 and (414) 309-9038 have been identified as likely being Geo OWENS and Jhony MARCHENA respectively, as described below—however the user of (414) 788-9051 remains unknown beyond the nickname "Tre".

23.     Your Affiant searched the Wisconsin Department of Corrections (DOC) Inmate Solutions system and found that (414) 526-1156 was associated in that database with Geo OWENS, 4151 North 12th Street, Milwaukee, Wisconsin.

24.     Your Affiant further reviewed recorded Milwaukee County Jail calls and located a call placed by inmate #2022007557 on January 17, 2023, at 1:34PM to (414) 526-1156.  In that call, the inmate referred to the male who answered the phone as "Geo".  Your Affiant also obtained records from AT&T related to Federal search warrant #23-889M related to (414) 526-1156.  According to AT&T records, (414) 526-1156 is registered to a "Rick James" at 4919 West Capitol Drive, Milwaukee, Wisconsin.  A query of that name and address did not produce results.  The email linked to the AT&T account is WUZYMOO@yahoo.com, which is an email

10

associated with Geo OWENS (DOB:10/15/1997) according to a query of the law enforcement database TLO. The AT&T account has been active since June 11, 2021. Based on this information, I believed (414) 526-1156 to be possessed by Geo OWENS on February 19, 2023.

25. Similarly, I believe cellphone number (414) 309-9038 was likely possessed by Jhony MARCHENA (DOB: 2/23/2002) on February 19, 2023, because that number listed to him in TLO, (an online law enforcement database), and because I located a jail call made January 19, 2023, in which a male answered that number and described the specifics of his court appearance on that date. Circuit Court records confirmed that MARCHENA had an appearance for multiple cases on that date as described in the call.

26. On June 1, 2023, ATF executed Federal Search Warrant #23-MJ-122 at the residence of Jhony MARCHENA located at 9070 North 86th Street, Milwaukee, Wisconsin, and located an iPhone 13 Pro Max with the ID of Jhony MARCHENA. The data extraction, obtained pursuant to another Federal Search Warrant, showed it was activated with cellphone number (414) 309-9038 and had been used to access a Facebook account: "Jayy RackedUp" with Facebook ID #100040453024988. A review of publicly available images posted to "Jayy Racked Up" showed multiple images that matched the likeness of Jhony MARCHENA.

27. Your Affiant further reviewed text messages in the phone between MARCHENA and Kentreal EVANS aka "Trelly" at (414) 975-7826, which begin on 2/19/2023 (the date of the above-mentioned robbery) at 2:15PM and included exchanges on 2/25/2023 and 2/26/2023 in which MARCHENA seeks EVANS' help in further potential robberies—each time describing targets he was observing and describing the potential "move".

28. The contact list on MARCHENA'S iPhone 13 Pro Max included the following pertinent phone numbers:

11

**"Trelly"** – (414) 975-7826 [Previously associated with Kentreal EVANS]

**"Gts G"** – (414) 526-1156 [Previously associated with Geo OWENS]

**"Gee"** – (305) 342-6049 [Subsequently associated with Geo OWENS]

**"Lil Tre"** – (414) 788-9051

**"Lil Tre"** – (414) 779-2527, which was created on 2/6/2023.

**"Lil Bro Monti"** – (414) 399-4919 [Later associated with Damonti LOCKHART]

**"Quis"** – (414) 397-2342, which was created on 12/30/2022.

**"Quis"** – (414) 779-7848, which was created on 2/24/2023.

**"Fredo2"** – (262) 283-2021, which was created on 1/16/2023 [ACOSTA's phone number, per Charter Communications, see below]

**"Zach"** – (414) 708-8210

29.    Your affiant noted that the contact list from MARCHENA's iPhone included not only the contact information of two of the known suspected conspirators: EVANS and OWENS ("Lilg Globaltrapstar" – Facebook ID #100000147312664), but also the accounts of the shooting victim ACOSTA ("Alfredo Acosta" – Facebook ID #100004126687957; "fredo_100" – Instagram ID #414923653).

30.    Additionally, MARCHENA'S iPhone showed his Instagram account to be "thousand_8gramsz" / Instagram ID #19472308189.

31.    Your affiant also noted the discrepancy between ACOSTA and C.B. about whether a 3rd man had been with them at the time of the robbery. Your Affiant reviewed records from T-Mobile that were previously obtained pursuant to Federal search warrant #23-890M related to cellphone number (414) 397-2342, which was saved as "Quis" in MARCHENA's phone.

12

32. These records (ATF Item #26) showed that that number arrived at or near Potawatomi Casino at approximately 2:44AM on February 19, 2023, and then moved to the area of 1810 West Wisconsin Avenue by approximately 2:48AM until it returned to the area of Potawatomi Casino by approximately 3:05AM and then traveled to the area of 1810 West Wisconsin Avenue, remaining there until approximately 3:55AM when it became mobile and later arrived at or near the casino at approximately 3:56AM. The phone number then traveled away from the casino at or about 3:57AM. In their separate interviews, M.H., C.B. and Alfredo ACOSTA all stated that ACOSTA had dropped off the group at the casino, left and then returned to the casino. The movement of (414) 397-2342 to and from the casino on February 19, 2023, is consistent with that number being possessed by ACOSTA or someone that traveled near ACOSTA. Additionally, Your Affiant queried all Timing Advance data locations for (414) 397-2342 for the available dates January 20, 2023 – February 19, 2023, and found a cluster of location indicators for that device at or near the listed home address of Alfredo ACOSTA - 4323 South 110th Street, Greenfield, Wisconsin.

33. There was no Timing Advance data recorded for (414) 397-2342 between 5:35AM – 7:08AM on February 19, 2023, which is consistent with that device being off during that time. When the device was powered on at 7:08AM, the Timing Advance data showed it to be at or in the area of 4151 North 12th Street, Milwaukee, Wisconsin, which was the listed residence of Geo OWENS. Alfredo ACOSTA was hospitalized at this time and did not possess the cellphone.

34. Your affiant attempted to identify "Quis" by investigating the most frequent contacts in the call history of (414) 397-2342. The most contacted number, (414) XXX-6964, listed to C.H. per TLO at XXXX East Cudahy Avenue, Cudahy, Wisconsin. The Timing Advance data for (414) 397-2342 showed that the device had multiple location indicators in the area of XXXX

13

East Cudahy Avenue. Your Affiant interviewed C.H., who said the father of her children was Marquis HARRIS (DOB:XX/XX/1997) who had a current cellphone number of (414) 779-7848, which was the most current contact number for "Quis" in MARCHENA'S iPhone.

35. T-Mobile tower dump records showed that (414) 526-1156 [OWENS] called (414) 397-2342 [HARRIS] at 4:40AM and 4:57AM on February 19, 2023, while (414) 397-2342 was at or near 3600 West Pierce Street.

36. On July 6, 2023, ATF re-interviewed C.B. who stated that ACOSTA had dropped off C.B., M.H., and the third male at the casino and then ACOSTA left the casino. C.B. said it was ACOSTA'S idea to go to the casino. Your Affiant showed C.B. a Milwaukee Police Department booking photograph of Marquis HARRIS (DOB: XX/XX/1997) and asked if C.B had ever met the person in the photograph. Upon seeing the photograph of HARRIS, C.B. immediately stated, "That's him!" C.B. further stated that HARRIS was the fourth unknown male that was with C.B., ACOSTA, and M.H. on the night of the robbery. C.B. said HARRIS was with him and M.H. at the casino. C.B. also said HARRIS went to the afterparty with C.B. and ACOSTA. C.B. further stated that HARRIS was in the front passenger seat of ACOSTA'S Chrysler 300 when ACOSTA first picked up C.B. and M.H. earlier that night at C.B.'s house.

37. C.B. told your Affiant that he was "very confident" that HARRIS was the guy with them all night and that he had met HARRIS on previous occasions through ACOSTA and therefore knew HARRIS' face. C.B. stated he thought HARRIS looked like he was part Hispanic in person, but his photograph made him look more African American. C.B. said he recalled ACOSTA call HARRIS a name that sounded similar to "Reece".

14

38.     ATF specifically asked ACOSTA during his interview to identify the previously unknown third male who accompanied ACOSTA and C.B. to the afterparty and ACOSTA said he did not recall that a third person was with him and C.B.

39.     C.B. also volunteered that he had seen HARRIS on previous encounters hanging out with a local rap artist named "Global Star" or something similar.  Your Affiant then showed C.B. a digital photograph of Geo OWENS from OWENS' Facebook page "Lilg Globaltrapstar".  C.B. identified OWENS as the rap artist whom he had seen hanging out with HARRIS.

40.     The law enforcement database TLO showed (414) 399-4919 to be a T-Mobile number associated with Damonti Lamar LOCKHART (DOB: XX/XX/2003) at 4280 South 43rd Street, Greenfield, WI.  LOCKHART'S cellphone number was also located in the call detail records for: (414) 975-7826 (Kentreal EVANS), (414) 309-9038 (Jhony MARCHENA), (414) 788-9051 (unidentified suspect "lil Tre"), (414) 397-2342 (Marquis HARRIS), and (414) 526-1156 (Geo OWENS).

41.     Your Affiant subsequently reviewed business records (to include call detail records, Timing Advance data, and cell tower data) previously provided by cellphone carriers (via legal process) to create a timeline summary of contacts and general locations[2] of relevant cellphone devices related to the carjacking, abduction, shooting, and arson on February 19, 2023.

---

[2] Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data, Global Positioning Device ("GPS") data or Timing Advance Data. Based on my training and experience, Timing Advance data provided by T-Mobile has a GPS accuracy radius that ranges from approximately 100-300 meters.

15

The following timeline summary[3] is a revision of the pre-existing timelines as result of additional analysis of cellphone records and information obtained from interviews. Specifically, I believe that Alfredo ACOSTA was in possession of two cellphones on February 18-19, 2023. In previous reports, Your Affiant believed ACOSTA possessed (414) 397-2342 on February 19, 2023. However, an additional interview and cellphone data analysis has shown that (414) 397-2342 was likely possessed by Marquis HARRIS on that date and that cellphone may have traveled for a period of time with ACOSTA or near ACOSTA. Additionally, ATF received call detail records from Verizon regarding number (213) 474-6888 that revealed this number had numerous contacts with the mother of ACOSTA'S children. Specifically, the mother of ACOSTA'S children called this number numerous times following the shooting which is consistent with ACOSTA stating that she called one of his phones after the shooting. Therefore, it is believed that (213) 474-6888 was possessed by ACOSTA on February 19, 2023.

42. The following summary timeline does not include all contacts or movements of the cellphone devices. The timeline has been condensed to detail the apparent connection between co-conspirators and the alleged criminal activity.

---

[3] Information detailed in the subsequent timeline was derived from the following records: T-Mobile records for (414) 975-7826, which is a cellphone number associated with Kentreal EVANS (ATF Item #12 and #28); AT&T records for (414) 526-1156, which is a cellphone number associated with Geo OWENS (ATF Item #24 and #25); Verizon records for (414) 309-9038, which is a cellphone number associated with Jhony MARCHENA (ATF Item #29); T-Mobile records for (414) 788-9051, which is a cellphone associated with an unknown suspect "lil Tre" (ATF Item #27); T-Mobile records for (414) 397-2342, which is a cellphone associated with Marquis HARRIS – (ATF Item #26); Verizon records for (213) 474-6888, which is a cellphone associated with Alfredo ACOSTA – *ACOSTA cellphone #1* (ATF Item #51); Charter Communications records for (262) 283-2021, which is a cellphone associated with Alfredo ACOSTA – *ACOSTA cellphone #2* (ATF Item #23); T-Mobile records for cellphone tower dumps (ATF Item #10); T-Mobile records for (262) 402-0511, which is a cellphone number associated with C.B. (ATF Item #45); Surveillance video obtained near 3600 West Pierce Street (ATF Item #2); Interview of C.H.; Search of MARCHENA'S iPhone (ATF Item #40) seized during search warrant; T-Mobile records for the cellphone associated with Damonti LOCKHART – (ATF Item #93)

16

***All times are for February 18, 2023***

| | |
|---|---|
| 7:05PM | ACOSTA cellphone #2 called C.B. for 459 seconds. |
| 7:11PM | OWENS and MARCHENA both attempted to call HARRIS cellphone. |
| 7:14:52PM | ACOSTA cellphone #1 initiated a Facetime call with OWENS that lasted until 7:19:09PM. |
| 7:19PM | ACOSTA cellphone #1 called HARRIS cellphone. |
| 7:31PM | LOCKHART called OWENS for 1:05 minutes. |
| 9:48PM | Timing Advance data for HARRIS' cellphone showed it arrived in the area of downtown Milwaukee and stayed in that general area until approximately 2:24M on 2/19/2023. |
| 11:16PM | OWENS called HARRIS' cellphone for 201 seconds. |
| 11:37PM | OWENS called LOCKHART for 3:57 minutes. |

***All times are for February 19, 2023***

| | |
|---|---|
| 12:09AM | OWENS called LOCKHART for 13 seconds. |
| 2:44AM | HARRIS' cellphone arrived at or near Potawatomi Casino according to Timing Advance data. |
| 2:55AM | OWENS called HARRIS' cellphone. |
| 3:03AM | Timing Advance data for EVANS' cellphone showed it in the area of Potawatomi Casino and it stayed in the area of the casino until approximately 3:52AM. |
| 3:04AM | Timing Advance data for cellphone (414) 788-9051 showed it in the area of Potawatomi Casino until at least approximately 3:50AM. |
| 3:12AM | MARCHENA called LOCKHART. |
| 3:33AM | OWENS called MARCHENA for over 4 minutes in an apparent 3-way call with HARRIS' cellphone while MARCHENA utilized a |

17

| | |
|---|---|
| | cell tower and sector that provided coverage for an area that included Potawatomi Casino. |
| 3:41AM | C.B., M.H., and HARRIS were on video at Potawatomi Casino. |
| 3:41AM | OWENS called MARCHENA for 208 seconds while MARCHENA utilized a cell tower and sector that provide coverage for an area that included Potawatomi Casino. |
| 3:47AM | MARCHENA called OWENS while MARCHENA utilized a cell tower and sector that provided coverage for an area that included Potawatomi Casino. |
| 4:16AM | OWENS called MARCHENA while MARCHENA utilized a cell tower and sector that provide coverage for an area that included 3600 West Pierce Street. |
| 4:17AM | Surveillance video near 3600 West Pierce Street captured images of a white Jeep SUV travel eastbound on West Pierce Street. |
| 4:17AM | T-Mobile Timing Advance data showed EVANS' cellphone, as well as (414) 788-9051, were in close proximity to 3600 West Pierce Street at this time and then both devices subsequently traveled east. |
| 4:33AM | T-Mobile Timing Advance data showed HARRIS' cellphone had traveled west from West National Avenue and South 21st Street. |
| 4:33AM | MARCHENA called OWENS while MARCHENA utilized a cellphone tower and sector that provided coverage for an area that included 3600 West Pierce Street. |
| 4:36AM | Surveillance video near 3600 West Pierce Street captured the arrival of the 2020 Chrysler 300 that was driven by Alfredo ACOSTA and also occupied by C.B. and HARRIS. |
| 4:36AM | Timing Advance data showed that HARRIS' cellphone arrived near 3600 West Pierce Street and stayed in that area until approximately 5:19AM. |
| 4:38AM | Surveillance video captured the three occupants of the 2020 Chrysler 300 enter 3600 West Pierce Street. |
| 4:40AM | OWENS called HARRIS' cellphone for 75 seconds. |

18

| | |
|---|---|
| 4:42AM | OWENS called MARCHENA while MARCHENA utilized a cellphone tower and sector that provided coverage to an area that included 3600 West Pierce Street. |
| 4:43AM-4:46AM | Surveillance video captured a white Jeep SUV travel by 3600 West Pierce Street on three separate occasions. |
| 4:54AM | Surveillance video captured images of a white Jeep SUV parked in the alley immediately east of 3600 West Pierce Street. |
| 4:54AM-5:19AM | Timing Advance data showed EVANS' cellphone and (414) 788-9051 were in close proximity of 3600 West Pierce Street. |
| 4:57 AM | OWENS called HARRIS' cellphone while that number was at or near 3600 West Pierce and OWENS was utilizing a cell tower located at 3950 North Holton Street, Milwaukee which was over 7 miles northeast of 3600 West Pierce Street. |

*There is no activity on HARRIS' cellphone from 4:57AM – 9:01AM*

| | |
|---|---|
| 4:57:56AM | MARCHENA called OWENS while MARCHENA utilized a cellphone tower and sector that provided coverage to an area that included 3600 West Pierce Street. |
| 5:17AM | Surveillance video captured images of ACOSTA, C.B., and HARRIS exit 3600 West Pierce Street.  The three males walked toward the Chrysler 300 and ACOSTA had opened the driver's door and C.B. was near the middle of West Pierce Street when four suspects emerged from the area of the white Jeep SUV and appeared to point firearms at the victims at which time the victims got on the ground. The video further showed C.B., and ACOSTA were ushered by the suspects into the white Jeep SUV while HARRIS appeared to be placed in the Chrysler 300 along with one suspect from the white Jeep SUV. |
| 5:19AM | Surveillance video captured images of the white Jeep SUV and the Chrysler 300 travel southbound on South 36th Street and out of frame. |
| 5:19AM | Timing Advance data for EVANS, HARRIS' cellphone, and (414) 788-9051 showed that all three devices traveled away from 3600 West Pierce Street at this time. |

19

| | |
|---|---|
| 5:21AM | Timing Advance data showed that HARRIS' cellphone was in the area of 35th Street and I-94. |
| 5:21AM | Timing Advance data for EVANS' cellphone showed that this device was in the area of North 41st Street and I-94, Milwaukee. |
| 5:22AM | MARCHENA called (414) 788-9051 while MARCHENA utilized a cellphone tower and sector that provided coverage for an area that included I-94 immediately north of American Family Field and while (414) 788-9051 was also in that same general area. |
| 5:24:02AM | MARCHENA's cellphone password was entered to pair the cellphone with an unknown vehicle Uconnect software system via Apple Carplay. Uconnect is a software platform that can be found in the following vehicles: Chrysler, Dodge, Jeep, Wagoneer, Ram, and FIAT. |
| 5:31AM | MARCHENA called (414) 788-9051 while MARCHENA utilized a cellphone tower that provided coverage to an area that included I-894 and (414) 788-9051 utilized a cellphone tower and sector that provided coverage to an area that included 1727 West Mineral Street. |
| 5:32AM-5:36AM | Timing Advance data showed that EVANS' cellphone was in the area of South 24th Street and Lapham Street, which was less than 1 mile southwest of 1727 West Mineral Street. |
| 5:33AM | Timing Advance data showed that HARRIS' cellphone was near the shooting scene at 1727 West Mineral Street. |
| 5:34AM | OWENS called (414) 788-9051 while OWENS utilized a cellphone tower and sector that provided coverage for an area that included 1727 West Mineral Street. |
| 5:35AM | Timing Advance data showed that HARRIS' cellphone was near 1727 West Mineral Street. There was no Timing Advance data available again for this number until 7:08AM, which is consistent with the device being turned off. |
| 5:38:53AM | Phone number (414) 788-9051 [Unknown suspect] initiated a Facetime call with OWENS that lasted until 5:41:47AM. |
| 5:42:20 AM | MARCHENA had an incoming call from (414) 788-9051. |

20

| | |
|---|---|
| 5:43AM | 911 call for shooting near 1727 West Mineral Street – C.B. and ACOSTA fled from the white Jeep SUV near this location. |
| 5:52:04AM | MARCHENA had an incoming call from (414) 788-9051. |
| 6:18:41AM | MARCHENA initiated a Facetime call with OWENS that lasted until 6:18:58AM. |
| 6:35AM | MARCHENA called (414) 788-9051. |
| 6:35AM | LOCKHART called MARCHENA. |
| 6:37AM | OWENS called EVANS while EVANS was located near North Oakland Avenue and East Kenmore Place and OWENS utilized a cellphone tower located at 3950 North Holton Street, which was less than 1.5 miles northeast of 227 East Townsend Street. |
| 6:37:31AM | EVANS initiated a Facetime call with OWENS that lasted until 6:39:20AM. |
| 6:40AM | LOCKHART called (414) 364-9146 while both cellphones utilized a cell tower that provided coverage for an area that included 227 East Townsend Street, Milwaukee, Wisconsin. |
| 6:45AM | 911 call for vehicle fire at 227 East Townsend in Milwaukee – 2020 Chrysler 300 that had been stolen from ACOSTA at 3600 West Pierce. |

43.     Based on the above timeline, I believe OWENS played a role in coordinating the carjacking on February 19, 2023, and subsequent crimes, and OWENS' knowledge and participation is supported by his cellphone's movement to the area of the shooting after the carjacking.  I also believe the HARRIS and ACOSTA likely had prior knowledge of the carjacking and robbery based on the phone contacts with the people who appeared in the areas of the casino, the carjacking location, and the shooting location.  I believe that HARRIS was associated with OWENS, MARCHENA, EVANS, LOCKHART, and the possessor of (414) 788-9051 because all of those numbers were in the call detail records for HARRIS. LOCKHART'S participation in the

21

conspiracy is supported by his above contacts with the other actors, the apparent presence of his cellphone in the area of the vehicle arson as well as recorded jail calls that will be detailed later in this affidavit. The timing and sequence of calls, and the general locations of devices at critical times leads Your Affiant to believe there was a conspiracy to conduct the carjacking and subsequent crimes on February 19, 2023, amongst the following persons and others: Geo OWENS, Jhony MARCHENA, Kentreal EVANS, the possessor of (414) 788-9051, Alfredo ACOSTA, Damonti LOCKHART, and Marquis HARRIS. I further believe that ACOSTA traveled with HARRIS' cellphone while HARRIS was at the casino. The conspirators' crimes include violations of Title 18 U.S.C. § 2119 (carjacking), Title 18 U.S.C. § 924(c) (use of a firearm during the commission of a violent crime), Title 18 U.S.C. §§ 844(i) (use of fire to damage property affecting interstate commerce), and Title 18 U.S.C. §§ 844(h) (use of fire in furtherance of a federal felony).

44. Your Affiant previously obtained Meta Facebook records for Alfredo ACOSTA pursuant to Federal search warrant #23-MJ-140. Those Meta Facebook records revealed a verified cellphone number for ACOSTA as (414) 940-1675. Review of the Facebook records further revealed Facebook messenger communication between ACOSTA and C.B. During the late evening hours of June 17, 2023, ACOSTA sent messages that encouraged C.B. to meet ACOSTA out somewhere, but C.B. was not able to meet ACOSTA. During the early morning hours of June 18, 2023, ACOSTA and C.B. had the following exchange, in which they appear to both acknowledge that HARRIS was one of their attackers:

> **ACOSTA:** "Quis here lol"
>
> **C.B.:** "On wha lol u see him rn?"
>
> **C.B.:** "Who he wit"

22

**C.B.:** "Shit crazy u in there wit a limp cus of dude bitch bum ass i stg im mad asb now

23

*SPANISH: but he said like ENGLISH: he told me, like, that the only issue like they have with you or some shit was when that shit happened to you and shit, supposedly, G pulled up and was, like, oh why they did that shit to you 'cause supposedly everything he did or some shit. I said man, you know what I'm saying—I told him like—you can't, like, feel no type of way 'cause at the end of the day when –if you was to get hit, bro, you gon'-you gon' , you know what I'm saying, you gon' think bad about everybody around you, bro, you feel me? 'cause you know how you move and you don't expect that shit to really happen to you like that, unless it's people that's close to you, you feel me?*

**ACOSTA**: *He said—they said that, what? That G what?*

**JT:** *He said that supposedly, uh, G got on his ass 'cause --he said that supposedly he was thinking it was him and some other---and Monty/Monti that, uh, had, you know what I'm sayin', did that shit to you and shit.*

**ACOSTA:** *hmm*

**JT:** *And I was like, well—I was like well, I don't know my n—gga, like---*

ACOSTA: *SPANISH: Hey, are you with them right now?*

**JT:** *SPANISH: They are in the (unintelligible)*

**ACOSTA:** *Oh, okay, okay, okay*

**JT:** *SPANISH: Because they—they—they—they---they---when I got in here they—everyone tries to talk to me, bro, because when I enter places—the units—I don't talk to anyone, bro, I stay in my ENGLISH: lane*

**ACOSTA:** *SPANISH: Hey, don't give that asshole any information, you hear me?*

**JT:** *SPANISH: he's crazy, bro—*

**ACOSTA:** *ENGLISH: Hey, listen---hey, listen*

**JT:** *SPANISH: Tell me, tell me….*

**ACOSTA:** *SPANISH: It was them, you hear me? So be careful. They're going to try to talk to you and get information.*

47.     My interpretation of the above conversation is that J.T. informed ACOSTA that

associates of "G" (Geo Owens) named "Sheisty" and "Monty/Monti" [BEHRMAN-MCDONALD

and LOCKHARD] had something to do with shooting ACOSTA and ACOSTA confirmed those suspicions.

48. Your Affiant also reviewed recorded jail calls placed by Zachary BEHRMAN-MCDONALD (DOB: XX/XX/2002) while he was incarcerated at Dodge Correctional Institution between 8/04/2023 – 10/02/2023 and Oak Hill Correctional Institution between 10/02/2023 – 10/04/2023. The following is a summary of downloaded phone calls placed by BEHRMAN-MCDONALD during this timeframe.

49. On September 18, 2023, at 1:03PM, BEHRMAN-MCDONALD placed a recorded call to (414) 940-9151 and a male answered the call. Phone number (414) 940-9151 is a phone number listed to Damonti LOCKHART at 4280 South 43rd Street, Milwaukee, WI according to the Wisconsin DOC Inmate Solutions payment history. BEHRMAN-MCDONALD asked the male, "Guess who I'm in here with?" and the male asked who. BEHRMAN-MCDONALD explained he was in Dodge Correctional with "Jay" and "Jay" claimed to have been at the Milwaukee County House of Corrections with the male. A query of Milwaukee County Jail records showed that Damonti LOCKHART (DOB: XX/XX/2003) was at the Milwaukee County House of Corrections from May 27, 2023, until his release on GPS monitoring on August 23, 2023. BEHRMAN-MCDONALD further said that Jay was with him at the time of the call. BEHRMAN-MCDONALD further said that Jay is friends with "Fredo" and that "somebody got" Fredo. BEHRMAN-MCDONALD also said, "You need to check-in with somebody, too cuz… he said they took the watch, the Cuban, 60k." [Cuban is a known style for neck chains and ACOSTA reported a necklace was taken during the robbery]. LOCKHART originally appeared to not understand the reference that BEHRMAN-MCDONALD was making. LOCKHART subsequently responded, "Ooh…never…remember, Chubby got the Cuban and they never did get

25

something off (unintelligible)…they never made nothing off that shit…" BEHRMAN-MCDONALD further said that Jay was telling him that "he" thought BEHRMAN-MCDONALD did "that" because BEHRMAN-MCDONALD "fucks with G". BEHRMAN-MCDONALD also said Jay had asked him who "GTS Merk" was and BEHRMAN-MCDONALD said he thinks Jay is referring to "Quis". BEHRMAN-MCDONALD said that Jay had explained the whole story about what happened to Fredo. LOCKHART asked if his name had been brought up and BEHRMAN-MCDONALD said no. BEHRMAN-MCDONALD said Fredo thought "G" had something to do with it. BEHRMAN-MCDONALD further said Jay told him that "they" were going to do the same thing to "G" because "G" had set that up. LOCKHART replied that he would tell "him" right now. BEHRMAN-MCDONALD instructed LOCKHART to tell "him" that something "fishy" was going on. LOCKHART said that Jay knew LOCKHART because LOCKHART'S mother is Jay's "case manager". BEHRMAN-MCDONALD said that Jay said that Fredo was at the club with "GTS Merk" when GTS Merk asked Fredo to see his "water splasher" and then Fredo woke up and was getting hit with the "water splasher", and they put Fredo in a "white SRT". ["Water splasher" is a term often used for a water gun and I believe is used in this phone call to mean a real gun. "White SRT" appears to be a reference to the white Jeep Grand Cherokee SRT used by the robbery suspects as seen in surveillance videos.] Later in this same call, BEHRMAN-MCDONALD said that Jay had saw "G" in a strip club at one point and contacted Fredo and asked Fredo what he wanted to be done, and Fredo told Jay to leave him alone. BEHRMAN-MCDONALD instructed LOCKHART to tell "G" to stop being "so loose" and LOCKHART agreed to relay the message.

50. On September 19, 2023, at 11:37AM, BEHRMAN-MCDONALD placed a recorded call to (414) 388-7565 and a male answered the call. During the call, BEHRMAN-

26

MCDONALD informed the male that "G" was holding onto money for BEHRMAN-MCDONALD. At the approximate 12:27 mark in the call, BEHRMAN-MCDONALD asked, "…remember I pulled that move with (unintelligible) and them?...and we put dude in a car and shit?" The male responded with a "yeah". BEHRMAN-MCDONALD said, "His nigga up in here. He was talking about it…the nigga said he lost a Cartier watch, 60 thousand…why do niggas be lying?" BEHRMAN-MCDONALD said they guy must've "took a loss before that."

51. On September 19, 2023, at 1:11PM, BEHRMAN-MCDONALD called LOCKHART at (414) 940-9151 and asked LOCKHART if LOCKHART had talked to "G" and told "G" what BEHRMAN-MCDONALD instructed LOCKHART to share with "G". LOCKHART said that "G" said "dude was soft" and to tell "little brother" to curse him and that "G" will spit in Fredo's mamma's face.

52. On September 29, 2023, at 1:10PM, BEHRMAN-MCDONALD placed a recorded call to Geo OWENS at (404) 735-9068. In the preamble of the call BEHRMAN-MCDONALD identified himself to OWENS as "Sheisty". During the call, OWENS told BEHRMAN-MCDONALD that OWENS was working on a house on 11th Street. BEHRMAN-MCDONALD asked OWENS if "Cuz" told OWENS what BEHRMAN-MCDONALD has said. OWENS responded, "About Fred?" OWENS continued by alluding that he had talked to "Fred" and Fred claimed he had nothing to do with "that" and that he was just "talking".

53. On October 4, 2023, at 1:01PM, BEHRMAN-MCDONALD called (414) 399-4919 (LOCKHART) and no one answered.

54. On October 4, 2023, at 1:03PM, BEHRMAN-MCDONALD called LOCKHART at (414) 940-9151 and another male answered the call and BEHRMAN-MCDONALD asked where "Monti" was. BEHRMAN-MCDONALD also told the male to tell LOCKHART that

27

BEHRMAN-MCDONALD just tried calling LOCKHART on his other number and LOCKHART didn't answer. LOCKHART eventually came on the phone to speak to BEHRMAN-MCDONALD.

55. Your Affiant later reviewed Milwaukee Police Department reports related to Case #23-013-0121, which involved a shooting on January 13, 2023. BEHRMAN-MCDONALD was shot in the hand during that incident and subsequently interviewed by the Milwaukee Police Department. BEHRMAN-MCDONALD reported a cellphone number of (414) 708-8210 at that time, which is a Verizon phone number. A query of the law enforcement database TLO also associates phone number (414) 708-8210 to BEHRMAN-MCDONALD. Your Affiant queried Jhony MARCHENA'S cellphone records previously obtained via federal search warrant (ATF Item #29) and located BEHRMAN-MCDONALD'S cellphone number (414) 708-8210 in MARCHENA'S February and March 2023 call detail records. Additionally, a query of records located on MARCHENA'S previously seized cellphone (ATF Item #40) showed a contact name "Zach" linked to phone number (414) 708-8210.

56. Your Affiant also reviewed data obtained from Apple related to Geo OWENS' iCloud account associated with only1gmusic@gmail.com obtained via Federal Search Warrant. A review of internet searches conducted by OWENS showed that he searched the phrase "17th mineral" on February 22, 2023, at approximately 5:52PM, which I believe to be a search related to the shooting scene.

57. Additionally, Your Affiant reviewed archived Instagram direct messages that were saved in OWENS' iCloud records. OWENS' records showed an Instagram username of "globaltrapstarr" with ID #6870064961, which had the following Instagram direct message thread with an unknown subject on February 19, 2023:

28

**2:22AM (Unknown):** "Poto?? Tell quis DM me back"

**2:30AM (OWENS):** "Tellin him now"

**3:30AM (OWENS):** "You at pato"

**3:42AM (Unknown):** "No but i could come"

**4:32AM (OWENS):** "You end up going"

58.　　I interpret the above Instagram exchange between OWENS and an unknown user as the unknown user was trying to confirm the meeting location was Potawatomi Casino in Milwaukee, but the unknown user could not reach Marquis HARRIS. I believe the unknown user was likely solicited to participate in the robbery but did not show-up.

59.　　Your Affiant located the following sms/mms text message thread between OWENS and (773) 640-3853 on February 25, 2023 (Time was Apple system time):

**10:55PM (*773):** "I'm send u vid rn"

**11:03PM (*773):** "U land yet"

**11:03PM (OWENS):** "yea just did"

**11:17PM (*773):** "$1000"

**11:37PM (OWENS):** "All 3 Za?"

(773) 640-3853 responded with multiple texts that stated: "Yea…Runtz…U say u need 50 @ 1000…43 and 13 can do 1000…Rest can do 950".

60.　　A review of videos in OWENS' iCloud data showed a video created on 2/25/2023 at 11:35PM of a hand holding a leafy substance consistent with the appearance of marijuana. I know from training and experience that the terms "za" and "Runtz" are types of marijuana.

29

61.     Additionally, your Affiant located multiple images in OWENS' iCloud records depicting leafy substances consistent with the appearance of marijuana.  The images include two created on February 26, 2023, in which one of the images was labeled "BR-43" and the other was labeled "BR-13", which appeared to be the names or types of marijuana depicted in those images (IMG_6266 and IMG_6270) and referenced in the above texts.

62.     The following Instagram direct message thread occurred between OWENS and an unknown subject on February 17, 2023 – March 30, 2023:

> **(Unknown):** "U back yet bros, I wasn't gone ask but the lil plug bitch I got playing and ion got shii rn"
>
> **(OWENS):** "Yea what u needed gang"
>
> **(Unknown):** "Shii whatever u wanna throw me I need shake back, a qp or hop coo bros"
>
> **(Unknown):** "Brody bros u got some ps around fa 500 or 400"
>
> **(OWENS):** "Monti got em"
>
> **(Unknown):** "Finna text em"
>
> "Send me his ig can't find it" **[IG is short for Instagram]**
>
> **(OWENS):** "Lowrackedd"
>
> *An Instagram username Lowrackedd2 (ID #54098924266) was found in OWENS' iCloud contacts. Based upon this conversation, your affiant has associated Lowrackedd2 (ID #54098924266) with LOCKHART.*

63.     Based upon training and experience your affiant believes that "qp" and "hop" in the text messages above refer to a "quarter pound" and a "half pound" respectively, and that "p" for around $500 would be a request for a pound of marijuana for that price, which would represent a low-cost, bulk style purchase.  The Instagram messages between OWENS and the

30

above quoted unknown Instagram user found in OWENS' iCloud records spanned the following dates: 10/08/2022 – 1/29/2023.

64. Your Affiant observed multiple Instagram messages between OWENS and unknown usernames in which OWENS offered for sale or was requested to sell "Za" or "Fire", which are two known types of marijuana. OWENS also provided his number in Instagram messages as (414) 526-1156.

65. A review of Apple Notes showed a note that was created on November 17, 2022, that appeared to depict drug types and quantities:

**19 small**

**6 za**

**17 za swizz**

**13 za pop up**

**10 icc**

**10 bubba**

**10 Oreo**

**Mont 1 za**

**Bo 1 za**

66. ATF previously received records from Meta regarding Instagram account "globaltrapstarr" with ID #6870064961 pursuant to Federal Search Warrant #23-M-509(SCD). Instagram account "globaltrapstarr" was previously associated with Geo OWENS. The following is a summary of the records provided by Meta related to the OWENS' Instagram account "globaltrapstarr". The data included in the records were for the dates 10/01/2022 – 12/07/2023.

31

67.     OWENS' Instagram account showed direct message contacts with the following Instagram users:

   A. "fredo_100" / account ID #414923653 (An account associated with Alfredo ACOSTA)

   B. "thousand_8gramsz" / account ID #19472308189 (An account associated with Jhony MARCHENA)

   C. "stayingoutyoway" / account ID #48331892912 (An account with public images consistent with Kentreal EVANS)

   D. "lowrackedd2" / account ID #54098924269 (An account associated with Damonti LOCKHART)

   E. "lilquis_4" / account ID #800293840 (An account suspected to be associated with Marquis HARRIS, who goes by the name "Quis")

68.     Your Affiant knows from training and experience that partial or whole Instagram messages and their attachments can be deleted by the user.  A review of OWENS' Instagram direct messages revealed the following available data from the night of the carjacking:

***February 18. 2023***

       8:16pm – OWENS sent an unknown attachment to "lowrackedd2" and "lilquis_4"

       11:25pm – OWENS asked "lowrackedd2" (LOCKHART) his location

       11:26pm – "lowrackedd2" (LOCKHART) responded "Downtown"

***February 19, 2023***

       12:13am – OWENS sent unknown attachments to "lowrackedd2" and "thousand_8gramz"

       6:13:14am – OWENS received an audio call from "stayingoutyoway" that ended at 6:13:46am

32

69. Based on the timing of OWENS' above communications with suspected participants in the carjacking, I believe the communications and since delated attachments likely were related to the coordination of the upcoming carjacking. I further believe that username "lilquis_4" is Marquis HARRIS because HARRIS' cellphone number(s) have been labeled in MARCHENA'S cellphone contacts as "Quis". Review of ACOSTA'S iCloud data also showed HARRIS' cellphone number listed as "Quis". Finally, I was able to locate a publicly available Facebook account which depicted the user's image as Marquis HARRIS but the profile name was "Michael Corleone", which is a character from the Godfather movies. Instagram username "lilquis_4" has a profile picture also depicting the character Michael Corleone.

70. OWENS' direct messages included messages to and from "fredo_100" (ACOSTA) that spanned the dates 10/07/2022 – 11/17/2023. The messages included a message from ACOSTA to OWENS on 1/15/2023 in which ACOSTA said he had "25k" for OWENS and OWENS responded that he needed the whole "25k" "now". OWENS further instructed ACOSTA to "call Quis" when ACOSTA had the money. On 2/28/2023, OWENS asked ACOSTA for his phone number and ACOSTA provided (323) 301-1476. On 10/02/2023, ACOSTA provided his phone number as (414) 940-1675. On 10/15/2023, OWENS informed ACOSTA that OWENS would be calling ACOSTA from a (404) number. Your Affiant previously obtained Facebook records for ACOSTA which revealed ACOSTA was engaged in the trafficking of large quantities of marijuana. With this information as a backdrop, it is probable that the "25k" ($25,000) reference between ACOSTA and OWENS on 1/15/2023 was related to a drug transaction. Additional review of OWENS' Instagram messages showed numerous conversations between OWENS and others that indicated that

33

OWENS was trafficking marijuana in large quantities. The following are summaries of OWENS' conversations related to drug trafficking:

71. OWENS had several messages with username "nodaysoff_19" / ID #40452266 in which OWENS offered to sell "za" and "cookie", which are both known strains or types of marijuana. On 2/09/2023, "nodaysoff_19" asked how much "za" was selling for. OWENS responded with "13 14" which often refers to $1300 - $1400 per pound. OWENS then sent two videos that depicted large bags of marijuana that were labeled "Baccio" and "Gelato Fuel" which referred to the strains of marijuana. OWENS and "nodaysoff_19" agreed to meet that same day and appeared to do so with "nodaysoff_19" stating they would be in a tan Camry. On 10/24/2023, OWENS messaged that he had some premium for "16" which refers to $1600 per pound, and OWENS provided his number as (404) 735-9068. On 10/28/2023, OWENS sent "nodaysoff_19" a video depicting a large bag of marijuana and "nodaysoff_19" asked the cost. OWENS responded that it would cost "15" or "16" and there were two flavors.

72. On 10/28/2023, OWENS sent a video that depicted a large bag of apparent marijuana to username "seventy6ix_mula" / ID #206448939. When asked how much for the marijuana, OWENS replied "14" for $1400.

73. On 10/23/2023, OWENS offered to sell "za" for $1600 and "low purple" for $1200-$1300 per pound to username "trap.dawg_" / ID #8570257436.

74. On 10/29/2023, OWENS sent a video of "za" to username "bigbabylow29" / ID #43870409496 and offered to sell the marijuana for $1500-$1600. Based on the message exchange, it appears that OWENS and "bigbabylow29" met on this date in an unknown parking lot.

34

75. On 11/09/2023, OWENS offered to sell "cookie" and "za" to username "kev_outthe way" / ID #346097875.

76. OWENS had numerous messages with "lowrackedd2" (LOCKHART) between 10/14/2022 – 11/10/2023, including messages regarding "za" transactions. On 10/30/2022, LOCKHART sent OWENS an image that depicted LOCKHART, OWENS, and HARRIS in the same photograph with LOCKHART holding what appeared to be, an assault rifle.

77. On 10/20/2023, username "wtfemmyglod" / ID #298840732 stated they would send money to OWENS via CashApp. OWENS responded that he was about to go into Huber and that he would have different types of "za" the next day. On 10/23/2023, OWENS said he had a couple types of premium (marijuana) for "15" ($1500). On 10/27/2023, OWENS sent "wtfemmyglod" a video that depicted a large bag of apparent marijuana that he claimed was "za". On 10/30/2023, OWENS sent two videos of apparent bags of marijuana. OWENS and "wtfemmyglod" exchanged messages over multiple days in which they negotiated an apparent price for the marijuana. "wtfemmyglod" asked OWENS for 2 (pounds) of premium for "3" ($3000). They agreed to meet on 11/02/2023.

78. OWENS also had Instagram direct message exchanges with individuals who were prospective suppliers of marijuana to OWENS, as summarized below:

79. On 6/17/2023, username "itsdevinalexander" / ID #41257229 sent two videos that depicted apparent large bags of marijuana to OWENS and told OWENS that the bags were going for $850 and came in two flavors. OWENS asked about "za" and "itsdevinalexander" told OWENS that za prices were high due to transportation costs. "itsdevinalexander" said he lived in Orlando. "itsdevinalexander" later provided his phone number as (347) 743-0066.

35

80. On 9/05/2023, OWENS messaged username "bigswizzi" / ID #847278688 that OWENS needed help to get on his "feet" since OWENS couldn't "leave until November" because of his work release. "bigswizzi" responded with three separate messages regarding different strains of marijuana for sale. OWENS asked if "bigswizzi" could "front" OWENS 10-20 [bags or pounds]. "bigswizzi" then asked OWENS what OWENS' turn around would be for the "bubba" strain. OWENS responded, "Depends How they look & I be out 8 hours a day except Wednesday so I can have shit in motion like b4." "bigswizzi" told OWENS that they would need to split the profit and later sent a video to OWENS that depicted a bag of apparent marijuana. OWENS replied to the video with "Yea I can dump them." At one point, "bigswizzi" referenced being in LA and OWENS later said he needed to get out there but he was waiting on his probation officer. On 11/15/2023, OWENS asked how the "fake za" was looking. "bigswizzi" responded that it was "under a stack" (under $1000).

81. On 10/20/2023, OWENS asked username "_aleinla_" / ID #5774583482 if they had "za" and they said no, but they had "other shit" they could send to OWENS for $1200 (per pound). On 11/05/2023, OWENS asked if they had "cookie" and they said no.

82. On 4/29/2023, username "jgao1992" / ID #4223993683 sent OWENS 13 separate videos that depicted, what appeared to be, bags of marijuana labeled with different names. OWENS responded, "Get them 5 high zas." On 6/19/2023, "jgao1992" asked for OWENS' location. On 10/27/2023, OWENS asked "jgao1992" for their number and "jgao1992" provided (312) 451-0269. Later this same date, "jgao1992" asked OWENS when OWENS was going to pay. OWENS responded that he would pay in 3 weeks. OWENS said he hadn't called because he'd been in jail. On 11/17/2023, "jgao1992" again asked OWENS when he would pay and added that they knew OWENS was out (of jail).

36

83.     On December 12, 2023, ATF executed Search Warrant #23-M-514 at LOCKHART'S residence and on LOCKHART'S Lincoln MKT SUV in the driveway. During the search warrant, ATF located approximately .8 pounds of marijuana inside the garage along with drug packaging material inside LOCKHART'S bedroom. A search of LOCKHART'S vehicle revealed approximately .8 pounds of marijuana in the center console along with a digital scale and a loaded 9mm Glock handgun. Investigators also located over $7,000 of US currency in various denominations both on LOCKHART'S person and inside the vehicle's center console.

84.     ATF later reviewed recorded jail calls placed by Damonti LOCKHART while incarcerated at the Milwaukee County Jail between 12/14/2023 – 12/21/2023. The following is a summary of calls placed by LOCKHART from the Milwaukee County Jail during this timeframe:

85.     On December 14, 2023, at approximately 12:11pm, LOCKHART called a male at (414) 940-9151. LOCKART stated that someone must have told on him. The male asked LOCKHART who was "Acosta" and "C.B" and then detailed to LOCKHART the items that law enforcement were searching for during the search warrant. LOCKHART instructed the male not to talk too much on the phone. LOCKHART asked the male if the male had talked to "G" and the male said no. Then LOCKHART said, "Remember, I left my clothes at your house?" The male said yes. LOCKHART then asked the male if the male had taken anything. LOCKHART then stated, "You know what I'm talking about clothes, right?" The male responded that "they" were still there. LOCKHART instructed the male to give all the "clothes" to "G" because it was G's "shit". LOCKHART told the male to save LOCKHART "one pair of shoes". LOCKHART said he couldn't say too much on the phone. The male

37

informed LOCKHART that law enforcement was looking for grills and chains like someone had been robbed. The male later confirmed that LOCKHART wanted to give all his "clothes" to "G" but keep one "pair of shoes", and LOCKHART gave confirmation. The male began to explain that there were "8 pairs of shoes" but LOCKHART angrily interrupted the male and told the male to "shut the fuck up." LOCKHART asked the male if the male had been on LOCKHART'S Instagram and the male said yes. LOCKHART then instructed the male to post on LOCKHART'S Instagram that "Monti can't talk" right now but they could "at him" on the tablet, and LOCKHART then provided his booking number.

86. On December 14, 2023, at approximately 4:14pm, LOCKHART used the pin for fellow inmate Amonte Baker to call the male at (414) 940-9151. The inmate voice was consistent with that of LOCKHART and LOCKHART told the male that the male needed to answer calls from other inmates because LOCKHART intended to use other inmate's pins. LOCKHART asked the male if the male had spoken to "G" and the male said yes. The male told LOCKHART that LOCKHART needed to talk to "Lil Von" because he was mad at LOCKHART. LOCKHART asked if "Lil Von" was mad about the money he had given LOCKHART. The male said yes, because "Lil Von" expected to have some "shoes". LOCKHART then told the male to call "Lil Von" 3-way which he did. When "Lil Von" answered, LOCKHART assured him that his "shit" was at another house. The male then got back on the phone call and told LOCKHART that the Lincoln in Zach's name was at his house. LOCKHART asked if law enforcement had searched the Lincoln and the male said yes. The male asked if LOCKHART wanted to know what was found in the Lincoln, to which LOCKHART said, "I already know what they found." LOCKHART then asked if the warrant was for drugs and guns. The male later asked LOCKHART who was "Acosta" and "C.B."

38

Near the end of the call, the male confirmed that LOCKHART wanted the male to give "7 pairs of shoes" to "G". LOCKHART confirmed that but also told the male to keep one pair of shoes for LOCKHART when he gets out of jail. The male said he had "6 pairs" of shoes and that "Lil Von" had 2 pairs. LOCKHART told the male to tell "Lil Von" to bring that "shit back." The male told LOCKHART that he'd leave the best pair of shoes at his house. LOCKHART responded, "It's all the same shit…"

87. On December 15, 2023, at approximately 11:11am, LOCKHART called the male at (414) 940-9151 and asked the male if he was at school and the male said no. LOCKHART asked the male if "G" had pulled up on the male and the male said yes. LOCKHART asked if the male still had LOCKHART'S "one shoe" and the male said yes. LOCKHART then said, "No more talking."

88. On December 16, 2023, at approximately 5:18pm, LOCKHART called the male at (414) 940-9151. The male told LOCKHART that "G" had texted the male about the "Jordans". LOCKHART told the male that the male was supposed to have told "G" that there were only 5, not 6. The male said that "G" had claimed that "G" was supposed to get all of the shoes. LOCKHART said the male should have given 5 pairs of shoes to "G" while "Lil Von" were to give back the 2 pairs, and one pair was to be kept for LOCKHART.

89. On December 17, 2023, at approximately 12:46pm, LOCKHART called the male at (414) 940-9151. The male told LOCKHART that "G" got "that shoe." LOCKHART asked if it was the last one and the male said yes. The male said that "G" kept calling the male and said that he had a "fit for that shoe."

90. On December 20, 2023, at approximately 4:38pm, LOCKHART called the male at (414) 940-9151. LOCKHART said he told the male that LOCKHART saw the search

39

warrant.  The male later asked LOCKHART, "Who you told me to do that to on Instagram is Acosta?"  LOCKHART responded to the male by saying that LOCKHART didn't know what he was talking about and instructed the male to shut up.  The male responded, "My bad."

91.  On December 21, 2023, at approximately 12:19pm, LOCKHART called the male at (414) 940-9151.  LOCKHART told the male to call "G" and give "G" LOCKHART'S Instagram password.  LOCKHART then asked the male to place a 3-way call to "Lil Von" which he did.  LOCKHART explained to "Lil Von" that if LOCKHART could not get him "shoes" then he'd give his money back.

92.  Based on the totality of context found in this affidavit, I believe that "pairs of shoes" referenced in the above summarized jail calls is code for pounds or bags of marijuana being distributed by LOCKHART on behalf of "G" or Geo OWENS.

93.  Based on the information provided in this affidavit, I believe that Instagram records maintained by Meta will include direct message content and calls between OWENS, LOCKHART, MARCHENA, HARRIS and EVANS during evening hours of February 18, 2023, and the morning hours of February 19, 2023, in which there were communications made relevant to the conspiracy to commit carjacking in violation of Title 18 U.S.C. § 2119.

94.  Additionally, based on the information above, I believe Instagram records maintained by Meta will include direct message content between OWENS and LOCKHART in which statements were made relevant to the unlawful distribution of narcotics (namely marijuana) in violation of Title 21 U.S.C. § 841(a)(1).

40

95.     Instagram is a service owned by Meta, a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510.  Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the target account(s) listed in Attachment A, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

96.     Meta collects basic contact and personal identifying information from users during the Instagram registration process.  This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers.  Meta keeps records of changes made to this information.

97.     Meta also collects and retains information about how each user accesses and uses Instagram.  This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

98.     Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time.  Instagram users can create multiple accounts and, if "added" to the

---

[4] The information in this section is based on information published by Meta on its Instagram website, including, but not limited to, the following webpages: "Privacy Policy," https://privacycenter.instagram.com/policy/; "Information for Law Enforcement," https://help.instagram.com/494561080557017; and "Help Center," https://help.instagram.com.

primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

99. Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account. Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality. For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account or transfer an image from Instagram to a connected image printing service. Meta maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

100. Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers). Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments. Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

101. Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users. Meta retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions. Users can similarly allow Meta to search an associated Facebook account for friends who are also Instagram users. Users can also manually search for friends or associates.

42

102. Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings. Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

103. One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos. Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location. These appear as posts on the user's profile. Users can remove posts from their profiles by deleting or archiving them. Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

104. Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram. Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@"). An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

105. An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours. Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted. The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

106. Instagram allows users to broadcast live video from their profiles. Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed

43

from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

107. Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups. These messages may include text, photos, videos, posts, videos, profiles, and other information. Participants to a group conversation can name the group and send invitations to others to join. Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings. Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot. Instagram Direct also enables users to video chat with each other directly or in groups.

108. Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps. Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

109. Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag. Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram. Meta retains records of a user's search history and followed hashtags.

110.    Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

111.    Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content.  Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers.  This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

112.    In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

113.    For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

114.    In my training and experience, evidence of who was using Instagram and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

45

115. For example, the stored communications and files connected to an Instagram account may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, voice messages, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. As was shown in Geo OWENS' iCloud data, OWENS used Instagram messaging to communicate with an unknown user regarding the plot to locate the carjacking victim(s) and OWENS used Instagram messaging to facilitate the sale of narcotics. Additionally, OWENS' used Instagram to communicate with his co-conspirators MARCHENA, HARRIS, EVANS, and LOCKHART on February 18 – 19, 2023.

116. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Meta can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, messaging logs, photos, and videos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

117. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan

46

to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

118.     Other information connected to the use of Instagram may lead to the discovery of additional evidence.  For example, associated and linked accounts, stored communications, photos, and videos may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators.  In addition, stored communications, contact lists, photos, and videos]] can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

119.     Therefore, Meta's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

**NEXUS:**

120.     Based upon Facebook and Instagram's capabilities as described above, affiant believes the requested data is likely to contain evidence of these crimes such as: images of OWENS, MARCHENA, HARRIS, EVANS, and LOCKHART possessing weapons or narcotics; images of and connections to individuals referenced within the probable cause section; communications with those individuals or unknown others about the carjacking and narcotics distribution; and searches and location data relevant to the robbery victims and location.

**AUTHORIZATION REQUEST**

121.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to title 18 U.S.C. §2703(c) and Federal Rule of Criminal Procedure 41.

47

122.    I further request that the Court direct Meta Platforms, Inc. to disclose to the government any information described in Attachment B that is within its possession, custody, or control. Because the warrant will be served on Meta Platforms, Inc., who will then compile the requested records at a time convenient to it, reasonable cause to permit the execution of the requested warrant at any time in the day or night.

123.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

48

# ATTACHMENT A

## Property to Be Searched

This warrant applies to information between February 1, 2023, and present date associated with the following Instagram account(s):

A. Instagram account under the name "thousand_8gramsz" / Instagram ID #19472308189 (An account associated with Jhony MARCHENA), **https://www.instagram.com/thousand_8gramz/**

B. Instagram account under the name "stayingoutyoway" / Instagram ID #48331892912 (An account with public images consistent with Kentreal EVANS), **https://www.instagram.com/stayingoutyoway/**

C. Instagram account under the name "lowrackedd2" / Instagram ID #54098924269 (An account associated with Damonti LOCKHART), **https://www.instagram.com/lowrackedd2/**

D. Instagram account under the name "lilquis_4" / Instagram ID #800293840 (An account suspected to be associated with Marquis HARRIS, who goes by the name "Quis"), **https://www.instagram.com/lilquis_4/**

That are stored at premises owned, maintained, controlled, or operated by Meta, a social networking company headquartered in Menlo Park, California.

1

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

**I.** **Information to be disclosed by Meta Inc. dba Instagram/Facebook.**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or other information that has been deleted but is still available to Meta, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) November 15, 2023, Meta is required to disclose the following information to the government for each account or identifier listed in Attachment A:

A. All business records and subscriber information, in any form kept, pertaining to the account, including:

1. Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

2. All Instagram usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts (including those linked by machine cookie), and all records or other information about connections with Facebook, third-party websites, and mobile apps (whether active, expired, or removed);

3. Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

4. Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

5. All advertising information, including advertising IDs, ad activity, and ad topic preferences;

2

6. Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers, from October 1, 2022, to present date;

7. Privacy and account settings, including change history; and

8. Communications between Meta and any person regarding the account, including contacts with support services and records of actions taken.

B. All content (whether created, uploaded, or shared by or with the account), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata, from October 1, 2022 to present date;

C. All content, records, and other information relating to communications sent from or received by the account from October 1, 2022, to present date, including but not limited to:

1. The content of all communications sent from or received by the account, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

2. All records and other information about direct, group, and disappearing messages sent from or received by the account, including dates and times, methods, sources, and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

3. All records and other information about group conversations and video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

4. All associated logs and metadata.

D. All content, records, and other information relating to all other interactions between the account and other Instagram users from October 1, 2022, to present date, including but not limited to:

1. Interactions by other Instagram users with the account or its content, including posts, comments, likes, tags, follows (including unfollows,

3

approved, and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

2. All users the account has followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

3. All contacts and related sync information; and

4. All associated logs and metadata.

E. All records of searches performed by the account from October 1, 2022, to present date; and

F. All location information, including location history, login activity, information geotags, and related metadata from October 1, 2022, to present date.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II. Information to be seized by the government.

All information described above in Section I that constitutes evidence of violations of Title 18 U.S.C. § 2119 (carjacking) and Title 21 U.S.C. § 841(a)(1) (distribution of a controlled substance) committed by Geo OWENS and others occurring after October 1, 2022, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

A. The sale of illegal drugs between OWENS, MARCHENA, HARRIS, EVANS, LOCKHART and others and communications between those individuals in preparation and commission of carjacking.

4

B. Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner;

C. Evidence indicating the account owner's state of mind as it relates to the crime under investigation;

D. The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s).

E. The identity of the person(s), including Instagram ID and username, who communicated with the account holder about matters relating to drug trafficking and carjacking, including records that help reveal their whereabouts.

5

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original    ☐ Du...

CLERK'S OFFICE
A TRUE COPY
Jan 16, 2024
s/ D. Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Instagram accounts A-D, as further described<br>in Attachment A | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.   24   MJ   21

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before   01/30/2024   *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to   Hon. William E. Duffin   .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   01/16/2024 at 9:40 a.m.

*Judge's signature*

City and state:   Milwaukee, Wisconsin          Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT A

## Property to Be Searched

This warrant applies to information between February 1, 2023, and present date associated with the following Instagram account(s):

A. Instagram account under the name "thousand_8gramsz" / Instagram ID #19472308189 (An account associated with Jhony MARCHENA), **https://www.instagram.com/thousand_8gramz/**

B. Instagram account under the name "stayingoutyoway" / Instagram ID #48331892912 (An account with public images consistent with Kentreal EVANS), **https://www.instagram.com/stayingoutyoway/**

C. Instagram account under the name "lowrackedd2" / Instagram ID #54098924269 (An account associated with Damonti LOCKHART), **https://www.instagram.com/lowrackedd2/**

D. Instagram account under the name "lilquis_4" / Instagram ID #800293840 (An account suspected to be associated with Marquis HARRIS, who goes by the name "Quis"), **https://www.instagram.com/lilquis_4/**

That are stored at premises owned, maintained, controlled, or operated by Meta, a social networking company headquartered in Menlo Park, California.

# ATTACHMENT B

## Particular Things to be Seized

## I.      Information to be disclosed by Meta Inc. dba Instagram/Facebook.

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or other information that has been deleted but is still available to Meta, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) November 15, 2023, Meta is required to disclose the following information to the government for each account or identifier listed in Attachment A:

    A.     All business records and subscriber information, in any form kept, pertaining to the account, including:

          1.     Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

          2.     All Instagram usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts (including those linked by machine cookie), and all records or other information about connections with Facebook, third-party websites, and mobile apps (whether active, expired, or removed);

          3.     Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

          4.     Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

          5.     All advertising information, including advertising IDs, ad activity, and ad topic preferences;

2

6.   Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers, from October 1, 2022, to present date;

7.   Privacy and account settings, including change history; and

8.   Communications between Meta and any person regarding the account, including contacts with support services and records of actions taken.

B.   All content (whether created, uploaded, or shared by or with the account), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata, from October 1, 2022 to present date;

C.   All content, records, and other information relating to communications sent from or received by the account from October 1, 2022, to present date, including but not limited to:

1.   The content of all communications sent from or received by the account, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

2.   All records and other information about direct, group, and disappearing messages sent from or received by the account, including dates and times, methods, sources, and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

3.   All records and other information about group conversations and video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

4.   All associated logs and metadata.

D.   All content, records, and other information relating to all other interactions between the account and other Instagram users from October 1, 2022, to present date, including but not limited to:

1.   Interactions by other Instagram users with the account or its content, including posts, comments, likes, tags, follows (including unfollows, approved, and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

3

2.     All users the account has followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

3.     All contacts and related sync information; and

4.     All associated logs and metadata.

E.     All records of searches performed by the account from October 1, 2022, to present date; and

F.     All location information, including location history, login activity, information geotags, and related metadata from October 1, 2022, to present date.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II. Information to be seized by the government.

All information described above in Section I that constitutes evidence of violations of Title 18 U.S.C. § 2119 (carjacking) and Title 21 U.S.C. § 841(a)(1) (distribution of a controlled substance) committed by Geo OWENS and others occurring after October 1, 2022, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

A.     The sale of illegal drugs between OWENS, MARCHENA, HARRIS, EVANS, LOCKHART and others and communications between those individuals in preparation and commission of carjacking.

B.     Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner;

4

C. Evidence indicating the account owner's state of mind as it relates to the crime under investigation;

D. The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s).

E. The identity of the person(s), including Instagram ID and username, who communicated with the account holder about matters relating to drug trafficking and carjacking, including records that help reveal their whereabouts.

5